RM

1

United States District Court
Northern District of Illinois

**Dorothy Ann Moore**
**Plaintiff**

**v**

**Defendants**
**Lifetime Remodelers, Inc.**

**Essex Insurance Company Insures**
**Lifetime Remodelers, Inc.**

**Joey Halperin , President/Contractor**
**Lifetime Remodelers, Inc.**

**Markel Service, Incorporated**
**Claims Service Administrator**
**for Essex Insurance Company**
**Essex Insures Lifetime Remodelers, Inc.**

1:15-cv-09185
Judge Elaine E. Bucklo
Magistrate Judge Jeffrey Cole



FILED

OCT 1 6 2015

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## COMPLAINT

(1)Next day, 07/02/2013 after fall (07/01/2013) had doctor examine and x-ray of hip. Experienced soreness; however pain continued to increase.

(2)<u>Discovery via MRI 10/16/2013</u> evidenced injury <u>Torn Meniscus</u> when examined for continuous pain from previous fall caused by <u>Egregious Act</u> - <u>Removal of Temporary Deck Step</u>.  <u>Additional injury Discoveries via MRI</u> for continuous pain evidenced changes: Cervical (MRI(12/05/2013))/Lumbar (New Disc Bulge (MRI(05/17/2015)).  Attached letter Dated November 16, 2013 to the Defendant details the experience of additional Egregious Acts by Defendant.

(3)Reported fall to Defendant Joey Halperin President of Lifetime Remodelers, Inc. Defendant stated "I just saw my life past in front of me!" Thereafter, Defendant made no

Complaint October 16, 2015:  Plaintiff Dorothy Ann Moore page <u>1</u> of 5

attempt to put the wood back being fully aware that I had fallen, and I previously stated that the front steps were too steep and affected/effected my mobility. Learned in letter from Markel Services dated July 13, 2015 that Defendant did not report fall; however, Tri-State Claims representative on July 13, 2015 stated Defendant did not deny removal of the temporary step or my reporting my fall and that I would receive a letter from A. Venn (Markel Services).

(4)Defendant with prior knowledge of the following stated within this Complaint stated the job would be completed within two weeks. Defendant was aware that this time frame was important to my well-being and this time frame would allow me to complete other improvements. Defendant said the job would start by June 15, 2013 and end June 28,2013.

(5)The Defendant broke my grounds June 15, 2013. On June 15, 2013, I became a hostage on my own property when Defendant removed the gravel, grass, and concrete and replaced it with framed gravel and gates wired shut. Prior to this action I provided detailed information to Defendant about my mobility, and limits in ability to navigate my steep front stairs. I could not use the deck or backyard for comfort, cooking or entertainment. Wind-blown gravel prevented use of my deck and the next door neighbors' use of their backyard for comfort, cooking or entertainment. I hoped the work would be finished in two weeks. I remained in the house until Friday, June 21, 2013. Thank God there was no electrical fire. Defendant removed its' company sign attached to the chain link fence on July 16, 2013.

(6)Defendant on June 07, 2013 while sitting on the deck we discussed concrete designs. I asked Defendant, "Is there anything that I can do to avoid shoveling snow?" Defendant said; "No", with a smirk smile as Defendant moved his head from left to right. Defendant detailed that I could not use salt on the concrete and if I did I would void the warranty; thereafter, Defendant amended the contract to support the discussion. This was an extreme egregious act how could I walk on ice if the purpose of the improvements/accommodations were to prevent falls on my own property? Thereafter, I had to do additional electrical upgrade to install heated concrete via cables to avoid living in an ice rink. Prior to this experience, I had no knowledge that heated concrete existed. Defendant denied having knowledge of heated concrete on June 07, 2013; however on August 01, 2013 Defendant admitted he had heard of other types of heated concrete but not "Warm Up".

(7)Days later, after June 07, 2013 Defendant drew a sketch; however, it did not fit the layout of my property. Defendant stated; "Other people just let us do what we want to do. They

don't ask for a sketch!" I asked Defendant, "Is it free! Mine is an accommodation not just a design."

(8)As of June 26, 2013, I had not received a layout of the design of the stamped concrete; therefore, I drew a scaled layout of my property and gave it to the Defendant on June 26, 2013. (See detail page 5 of 8). Defendant removed temporary step placed June 11, 2013 after new steps build to decrease deck step height(accommodation) prior to pouring concrete; however, I was not told the temporary step placed June 11, 2013 was removed.

(9)Defendant had prior knowledge to signing the contract of my disability as my motivation for having work done on my home, I said, "Beautification will be the side effect". "My disabilities are covered and therefore my rights are protected under the American with Disabilities Act."

(10)Defendant had prior knowledge I shared I had surgery to prevent me from becoming a quadriplegic and that the improvements are accommodations to prevent me from falling on my own property.

(11)Defendant had prior knowledge the improvements included: work to reinforce my deck accommodation build in 2011; change deck step height, ground improvements to remove the gravel and grass to make the backyard walking surface sturdy and solid, and a wrought iron fence "around the perimeter of backyard everywhere, where there is currently chain-link fence, ("remove chain-link if neighbors approve.)" I stated to the Defendant I had purchased items to enjoy outside and included food, outdoor appliances and furniture.

(12)Defendant had prior knowledge to signing the contract I stated that my disability affects/effects my mobility; as a result, I spend a lot of time at home.

(13)Defendant had prior knowledge of stated improvements would allow me to enjoy being outside and not feel trapped because of my limited mobility. I stated I do not like being or feeling trapped. I also shared with Defendant that I was trying to get a lower interest rate and eliminate other expenses on my home. An increase in equity would be a side effect.

(14)Defendant with prior knowledge of conditions stated within this Complaint stated job would be completed within two weeks. Defendant was aware that this time frame was

important to my well-being and this time frame would allow me to complete other improvements.  Defendant said the job would start by June 15, 2013 and end June 28,2013.

(15)Reported fall to Defendant Joey Halperin President of Lifetime Remodelers, Inc. Defendant stated "I just saw my life past in front of me!" Thereafter, Defendant made no attempt to put the wood back being fully aware that I had fallen, and I previously stated that the front steps were too steep and affected/effected my mobility.  Learned in letter from Markel Services that Defendant did not report accident; however, Tri-State Claims representative stated Defendant did not deny removal of the temporary step or my reporting my fall.

(16)Next day, 07/02/2013 after fall (07/01/2013) had doctor examine and x-ray of hip. Experienced soreness; however pain continued to increase.

(17)As a result of <u>Discovery via MRI 10/16/2013</u>  of evidenced injury <u>Torn Meniscus</u> , surgery scheduled December 18, 2013.  Stress Test December 18, 2013 evidenced good blood-flow; however,  breast density hindered clear visual of heart.  Recalled previous  chest pressure experience 10/2013. Reminded me of experience prior to previous stent placements: LAD (June 2002) and Circumflex (February 2003).  I was cleared for knee surgery 12/18/2013; however, I cancelled knee surgery 12/18/2013. Breast density would not allow clear visual of heart.  I said, "I'm not leaving here because of a knee!"  Surgery delayed.  Open heart surgery performed March 28, 2014.  Stroke March 29, 2014.  Rehab: 2014-2015   Required surgery on knee scheduled as of October 2015 pending clearance.

(18)As stated within my letter dated November 16, 2013 to Defendant regarding contract June 01, 2013, if I had prior knowledge of all circumstance and Defendant's limitations to perform and complete needed improvements/accommodations Defendant would not have received the contract to complete the work.  As of the date of this Complaint all work is not completed.

(19)My life has truly changed as a result of my experience with Defendant as detailed in the letter of November 16, 2013  written to the Defendant.  My life continues to change as a result of the Discovery via MRI 10/16/2013 of evidenced injury <u>Torn Meniscus</u> when examined for continuous pain and for additional injury Discoveries via MRI for continuous pain evidenced changes in spine: Cervical (MRI(12/05/2013)/Lumbar(New Disc Bulge( MRI(05/17/2015)).

(20)I Plaintiff, Dorothy Ann Moore am seeking amount to cover past, present and future injury, damages, surgery, rehabilitation, and all due as a result of all egregious acts actions disrespect shown toward me Dorothy Ann Moore who declared my reasons for establishing the contract was for accommodations to prevent me from falling on my own property and therefore to protect me from additional exacerbation of my disabilities.

(21)I Plaintiff, Dorothy Ann Moore am seeking from Joey Halperin (President)Lifetime Remodelers, Inc.,  Lifetime Remodelers, Inc., Essex Insurance Company the company that insures Lifetime Remodelers, Inc. and from Markel Services the claims administrator for Essex Insurance Company the company that insures Lifetime Remodelers, Inc. the amount of $1,000,000.00 to cover past , present and future injury, damages, surgery, rehabilitation, and all due as a result of egregious acts actions disrespect shown toward me Dorothy Ann Moore who declared my reasons for establishing the contract was for accommodations to prevent me from falling on my own property and therefore to protect me from additional exacerbation of my disabilities.

Date: 10/16/2015_____ Pro Se Dorothy Ann Moore___
Pro Se Dorothy Ann Moore
721 West 107th Street
Chicago, Illinois 60628-3130

Dorothy Ann Moore
721 West 107th Street
Chicago, Illinois 60628
(773) 468-8363

November 16, 2013

Joey Halperin                                                Re: **Contract; June 01, 2013**
**Lifetime Remodelers, Inc.**
**5875 N. Lincoln**
**Suite #45**
**Chicago, Illinois 60659**

Dear Joey,

Why do I need to write an eight page dissertation to detail the experience?

You said you would send pictures.  I have asked numerous of times for copies of the pictures. To date I have not received any pictures or itemized work expense documentation.  I shared with you that I do not have the personally of one who waits until an audit happens to prepare (documentation).  Anyone who has experienced an audit knows that not having the documentation ready has consequences of additional discovery and that usually results in additional expenses. You took pictures before you started the job.  Also, pictures were taken during and after completed work.

Prior to signing the contract we discussed my disability as my motivation for having work done to my home. I said, "Beautification will be the side effect".  My disabilities are covered and therefore my rights are protected under the American with Disabilities Act.

I shared I had surgery to prevent me from becoming a quadriplegic and that the improvements are accommodations to prevent me from falling on my own property. I stated my accommodations are tax deductions as well as equity improvements and therefore I need documentation to support the expense to prepare in case I am audited.  We discussed before and after pictures to evidence need for improvements.

You said the job would be completed within two weeks.   This time frame was important to my well-being. Also, this time frame would allow me to complete other improvements. You said the job would start by June 15, 2013 and end June 28, 2013.  In addition, there would be five increments of down payments. Four payments due as work is started and finished, and the fifth down payment due upon total completion of the job; thereafter the monthly payments were to begin approximately July 28, 2013.

In addition, prior to signing the contract I stated that my disability affects my mobility; as a result, I spend a lot of time at home. I stated the improvements would allow me to enjoy being outside and not

November 16, 2013
Re: **Contract; June 01, 2013**
Joey Halperin
Life Time Remodelers, Inc.
Page 2 of 8

feel trapped because of my limited mobility. I do not like being or feeling trapped. I also shared with you that I was trying to get a lower interest rate and eliminate other expenses on my home. An increase in equity would be a side effect.

The improvements included: work to reinforce my deck accommodation build in 2011, ground improvements to remove the gravel and grass to make the backyard walking surface area sturdy and solid, and a wrought iron fence "around the perimeter of backyard everywhere, where there is currently chain-link fence. (remove chain-link if neighbors approve.)". I stated I had purchased items to enjoy outside and included food, and outdoor appliances and furniture.

We did a "walk-through" of the basement area. During the basement "walk-through" I discussed my interest in a day-care center, and or a math tutoring center, and that this would require an electrical upgrade. As previously stated, I am a certified Math Teacher. I told you that I had received an estimate from the electrician that wired my home to do this upgrade. Sometime thereafter as we sat on the deck you said; "I don't want 'no' kids running around here!" I was puzzled and surprised. I thought "Wow! You must really want my house to be your outdoor model showroom!"

We discussed rebuilding and decreasing the height of the front stairs similar to the height of the deck stairs accommodation. You stated it would be less expensive if the work was done at the same time the concrete for the driveway was laid in backyard. I explained that I could not afford that accommodation now and because of the front stair height and its' effect on my disability that I rarely use the front stairs. I stated that I use the back stairs because the front stairs are too steep and my car is in the garage.

On June 07, 2013 while sitting on the deck we discussed concrete designs. I asked, "Is there anything that I can do to avoid shoveling snow?" You said; "No", with a smirk smile as you moved your head from left to right. You detailed that I could not use salt on the concrete and if I did I would void the warranty; thereafter, you amended the contract to support the discussion.

Meanwhile, we continued to discuss concrete designs. I reviewed a brochure that detailed stamped concrete designs and colors, and pictures via computer of completed work. I said; "What design would you suggest for my property?" Meanwhile, Max began and completed work to reinforce the deck accommodations. "Ignacio" displayed a physical sample of the wrought iron fence June 11, 2013. On June 15, 2013 "Paco" and his crew removed the gravel, dirt, grass, and concrete to lay the stamped concrete. The contract was signed June 01, 2013.

Days later, after June 07, 2013 you drew a sketch; however, it did not fit the layout of my property. You stated; "Other people just let us do what we want to do. They don't' ask for a sketch!" I asked; "Is it

November 16, 2013
Re: **Contract; June 01, 2013**
Joey Halperin
Life Time Remodelers, Inc.
Page 3 of 8

free! Mine is an accommodation not just a design."  I said, "As a Learning Specialist, I understand that a person can draw a design and not have the ability to lay the concrete as well as the fact that the person who has the ability to lay the concrete may not have the ability to draw the design. Thereupon, I asked for the measurements of the areas where the stamped concrete would be laid.

Days later, Paco returned to my home with another worker to do the framing.  He gave me some measurements on a piece of paper.  They were incomplete for me to do a layout drawing of the area.  I sat on the deck as they work on the framing.  I asked for specific measurements so that I could do a scale drawing.  I drew the scaled layout on Monday, June 17, 2013.  I showed it to Paco on Thursday, June 20, 2013.  He said; "Wow this looks professional!" He looked at me and said;"Joey did this?"  I said, "No, I drew it. That's why I asked for the measurements."

Days later, June 26, 2013 when the two of you came over I gave each of you a copy of the scale drawing with an attached flap so that you could include notes of the design layout.  You wrote something on your copy. Paco folded his copy and took it to his truck.  Since our conversation on June 07, 2013 regarding shoveling snow I learned of heated concrete.

On June 26, when I gave you a copy of the scaled drawing I told you I went online and found a company named "Warm Ups" that sells materials for heated concrete.  You told me don't worry about it that you would call them and other companies and find out the cost and let me know.

You left a message on my home phone on July 04, 2013. You said, "They can begin to lay the concrete tomorrow" (Friday, July 05, 2013).  However, you did not provide me with a design of the concrete layout or any information about the availability of heated concrete discussed as of June 26, 2013.  After the discussion on June 26, 2013, you stated that the cost estimates that you received ranged between 10, 12, and 15 thousands.

On June 07, 2013 you denied having knowledge of anything that would prevent me from having to shovel snow; thereupon amended the contract to void the concrete warranty if I used "salt" on the concrete.  After the June 26, 2013 discussion detailing the availability of heated concrete and estimates thereafter you stated; "I don't' believe getting the heated concrete is worth it!" Thereafter, on August 01, 2013, during our phone conversation you admitted that you had four years of prior knowledge of heated concrete.

Saying this to me, Dorothy Ann Moore, after I told you I had surgery to avoid becoming a quadriplegic evidenced egregious behaviors of disrespect and disregard toward my disability and purpose of the

November 16, 2013
Re: **Contract; June 01, 2013**
Joey Halperin
Life Time Remodelers, Inc.
Page 4 of 8

contract to make accommodations; hence, home improvements to prevent me from falling on my own property.

Specifically, Chicago during the winter months is a city with snow and ice. If I cannot use salt on the concrete to melt the ice to prevent slipping and possibly falling nor use prudence judgment to install heated concrete to melt the ice to prevent slipping and possibly falling then the objective to improve the property and accommodations to prevent me from falling could not be achieved; hence, there would be no need for a contract with you… Joey.

In addition, the height of the concrete influences the process for rebuilding the steps to my deck accommodations. I said; "With the number of "baby boomers" that want to remain in their own home, you're missing out on an opportunity to make a lot of money!" I said; "You need to have an electrician added to your team to benefit from Chicago winters and baby bombers desire to stay in their own home!"

As a Teacher this experience affected my heart. I enjoyed working with you and your contractors. What I did not enjoy was the lies. You tried to explain that I could say you're a bad contractor during the discussion to denied responsibility related to the outcome of the heated concrete. As I stated I don't do defamation of character observed behaviors evidence character.

I know that life is a learning experience; however, I have not stop loving or respecting myself and therefore I cannot allow you or anyone to denied or interfere with my rights to (1) minimize the effects of my disability and (2) improve and maximize the quality of my life.

You denied having knowledge of heated concrete on June 07, 2013. You breached the contract fulfillment date when the work was not completed 06/28/2013. Your denial of knowledge of heated concrete on June 07, 2013, and breach of contract fulfillment affects and has had effects limiting my ability to improve the quality of my life and minimize the expense of my home.

On June 15, 2013, I became a hostage on my own property when you removed the gravel, grass, and concrete and replaced it with framed gravel and gates wired shut. Prior to this action I provided detailed information about my mobility, and limits in ability to navigate my steep front stairs. I could not use the deck or backyard for comfort, cooking or entertainment. Wind-blown gravel prevented use of my deck and the next door neighbors' use of their backyard for comfort, cooking or entertainment. I hoped that the work would be finished within two weeks. I remained in the house until Friday, June 21, 2013. Thank God there was no electrical fire. You removed your company sign attached to the chain link fence on July 16, 2013.

November 16, 2013
Re: **Contract; June 01, 2013**
Joey Halperin
Life Time Remodelers, Inc.
Page 5 of 8

As of June 26, 2013 I had not received a layout of the design of the stamped concrete; therefore I drew a scaled layout of my property and gave it to you on June 26, 2013. On July 06, 2013 I emailed a copy of a picture of a driveway that I found on the internet that matched the layout of my property according to my scaled layout and labeled it "The Perfect Driveway".

On July 08, 2013, I called "Warm Up" myself. "Warm-Ups'" cost for the materials and the cost for a "Warm Up" vendor to install the cables to heat the concrete was nowhere near the cost estimates that you provided to do the heated concrete. "Warm Up" provided a referral and name of a "Warm Up" installer. I contracted with the "Warm Up" installer to do the electrical upgrade and to install the "Warm Up" cables.

Meanwhile, you continued to say; "I don't want you paying them my money!" The problem with this statement is if you had told the truth about having knowledge of heated concrete so that I would not have to shovel snow we would not have had a contract. Specifically, I am not sure why you believed the payment the "Warm Up" installer received belonged to you. As of June 15, 2013 I was held hostage on my own property when the gravel, grass, and concrete was removed and replaced with framed gravel and gates wired shut. I hoped that the work would be finished within two weeks. I remained in the house until Friday, June 21, 2013. Thank God there was no electrical fire.

On June 21, 2013, I went out the back to exit via the deck. On June 11, 2013, Max placed a moveable piece of wood aligned with the concrete underneath the right-side deck railing as the last step with similar height difference equal to the other steps to allow me to step off the deck on to the gravel without falling. On June 21, 2013, I untwisted the wire that held the small back gate shut and walked around the corner to the back of the garage to get my car. There I saw a terrain in front of the garage that remained after some of the concrete had been removed. I was careful to not turn my tires so I would not damage or break my front axle when I came out of the garage. Thereafter, I called you Joey and detailed my concern.

On July 01, 2013, I went out the back to exit via the deck. I turn backwards to step on to the piece of concrete on to the gravel and fell. The last step was missing. The piece of wood used as the bottom step had been placed in the terrain that remained after some of the concrete had been removed. I called you Joey and told you what had happened. There was a quiet pause; thereupon, you stated; "I just saw my life past in front of me!" Thereafter, you made no attempt to put the wood back being fully aware that I had fallen, and previously stated that the front steps were too steep and affected my mobility.

November 16, 2013
Re: **Contract; June 01, 2013**
Joey Halperin
Life Time Remodelers, Inc.
Page 6 of 8

After June 26, 2013, twelve days later you told me that you had called "Warm Up" and other vendors for heated concrete estimates. You stated again "I don't' believe getting the heated concrete is worth it!" That's a cruel statement Joey knowing that your "issue" related to the heated concrete pertains to your responsibility and liability for the concrete covering and attached to the "heated cable". This is the reason why one would not have heated concrete installed by two different contractors without a "work agreement" of shared liability. The contractor who installs heated cables and concrete would naturally get the contract to install the heated concrete.

A false sense of "Entitlement" is not a legal recourse. Again, each time something changed - effected by and based upon you not telling the truth you amended the contract to minimize your responsibility and liability for not telling the truth when I asked "Is there anything that I can do to avoid shoveling snow?" I shared I had surgery to prevent me from becoming a quadriplegic and that the improvements are accommodations to prevent me from falling on my own property. Your denial of having knowledge of heated concrete was made with full knowledge of my disability and purpose of the contract.

You continued to put me at risk as you completed other jobs. You left my property framed within 6-10 inches of gravel, removed wood that substituted for an incomplete step that was needed to allow me to step off the deck on to the concrete then on to the gravel. In addition, the mesh and wire prep had to be completed prior to adding the "Warm Up" cables. One of my goals is to prepare my home to be reappraised. Not telling the truth delayed completing the work as scheduled by June 28, 2013. Not telling the truth delayed the deck cleaning and staining process, as well as the projects to build storage selves within the garage and clean the garage. With heated concrete why do I have to wait until next summer to cook on the grill?

On July 07 2013, you told me you had no prior knowledge of anything that would keep me from needing to shovel snow off the concrete where as on Thursday, August 01, 2013 you said that you had heard of other types of heated concrete but not "Warm Up". This evidenced the fact that you did not call "Warm Up" to learn about their product or cost when you stated to me that you had called them and that their cost was in the same price range of 10,12, and 15 thousands.

The stamped concrete was laid on 08/10/2013. Three days prior Paco chose a lighter color for the concrete. I asked him to take pictures of the post lights to compare, contrast, and coordinate the colors to the concrete and with the deck. I also asked him to take pictures to detail the location of the cable attached to the "mesh prep" that he laid to avoid damage to the cable during the installation of the wrought iron fence. On August 10, 2013, "Paco" used a darker color. The stamped concrete was beautiful. It included two foot prints from the worker(s). "Paco" said he would remove the two foot

November 16, 2013
Re: **Contract; June 01, 2013**
Joey Halperin
Life Time Remodelers, Inc.
Page 7 of 8

prints during the process of laying the design where the gazebo would be placed. On August 30, 2013, Max completed the deck accommodations.

You agreed to give me $100.00 as a referral fee for people who saw the work done on my property and sought to have work completed. I asked for copies of your business cards; however you never gave me any business cards although I observed your contractors giving cards to people passing by as they completed work on my property. I observed many cars coming to the alley to observe my property. Specifically, pictures of the work done on my property were shown to others who contracted to have similar or the same work. Paco stated on September 20, 2013 that someone contracted to have work done only after seeing the picture of the stamped concrete through the wrought iron fence. We discussed an additional expense for materials to place against the exposed concrete.

Upon completing the stamped concrete Paco stated that he would place a plastic lining within the terrains below the wrought iron fence to stop the weeds from growing next to the exposed concrete. We discussed an additional work expense to be paid to Paco to fill in various areas with decorative rocks instead of dirt, and to purchase material to place against the exposed concrete. I purchased decorative lights to place within the decorative rocks to illuminate the property after dark.

Specifically, why do I need to write an eight page dissertation to detail the experience? I want documentation that details the contract itemized work expense and work completed. This document would detail the work that still needs to be completed; hence provide documentation to state the date or approximate date when work will be completed. Meanwhile, payments can be made toward the contract cost because your documents would list work to be completed and the approximate date that the work would be completed.

Incomplete work might have an effect when my home is reappraised but there would be documentation to evidence that the work is scheduled to be completed. If documentation exist that evidence the work expense and scheduled work to be completed I will not feel comprised according to the language of the contract signed on June 01, 2013 that states final down payment is paid after _all_ work is completed and monthly payment is due until contract amount is paid in full.

On June 07, 2013 prior to beginning the work, if I had knowledge of the heated cables you would not have gotten the contract. I have a disability and you were aware of it. You once stated that you questioned my cautionary measures put later understood why. I am not into defaming ones character. My goal is to understand the motivation. Motivation is what drives the behavior(s).

November 16, 2013
Re: **Contract; June 01, 2013**
Joey Halperin
Life Time Remodelers, Inc.
Page 8 of 8

### WORK TO BE COMPLETED

@ Remove excess sand from stamped concrete.

@Add wrought iron fence from driveway apron to ally.

  (**Note**: An Easement would not be an issue since the fence will not touch the ally.)

@ **The following areas need to be lined and filed**

    @West- Fence

    @South-Fence

    @Front Garage Door

    @ Behind concrete by basement stairs next to North Deck Railing covering cable installation

(**Note**: Max said fill with white rocks. I want it filled with black decorative rocks. I plan to add decorative solar lights to illuminate the property. I will pay the labor to add the solar lights. I will pay for the decorative black rocks ånd the material that lies between the rocks and the stamped heated concrete. @Repair Fascia on West-Side of the Garage.

Attached are checks number **3751**, and **3752** for November 2013 and December 2013  payments with "**MEMO**"

  "**Cash checks pending receipt of itemized work expense document with pictures**"

"**Cash ck. Pending rec. itemized wk. exp. doc. w. pictures.**" (Abbreviated Phrase)

I will continue to make monthly payments with the clause written in the memo section of the check until I receive documentation that details the contract itemized work expense; work completed, and work to be completed, with before and after pictures.

Sincerely,

Dorothy Ann Moore

# NORTHSHORE UNIVERSITY HEALTHSYSTEM

# EVANSTON HOSPITAL

## DEPARTMENT OF DIAGNOSTIC RADIOLOGY

**Patient Name:** MOORE-FOTSO, DOROTHY ANN
**Account Number:** 60187848
**Patient Location:** MRI EV

**Age:** 57 years     **Sex:** F
**Date of Birth:** 4/24/57

| Accession #:<br>MR-13-0044891 | Procedure Name:<br>MRI Knee W/O Contrast, (Right) | Exam Date<br>10/16/13 22:27:00 | Ordering Physician:<br>KOH, JASON L. |
|---|---|---|---|

## Results

HISTORY: Knee pain, patient fell 3 months ago, concern for lateral meniscal tear and loose body.

TECHNIQUE: Multiplanar, multisequence MR images of the right knee were obtained without IV gadolinium contrast.

COMPARISON: Right knee radiographs 10/15/2003.

FINDINGS:

Osseous alignment is maintained. There is no evidence of acute fracture, subluxation, or dislocation. Subchondral bony reactive changes are noted within the medial and lateral tibial plateau. Bone marrow signal intensity is otherwise within normal limits. There is a small suprapatellar joint effusion. No intra-articular loose body is identified.

There is diffuse grade 2/3 chondromalacia of the lateral compartment. There is diffuse grade 4 chondromalacia of the weight bearing surface of the medial compartment. There is diffuse grade 3 chondromalacia of the patellofemoral compartment. A full thickness chondral fissure is identified at the central trochlear groove (series 4 image 18). There are patchy areas of grade 4 chondral defect involving the patella. Multicompartment marginal osteophytes are seen, most prominent within the patellofemoral and medial compartment.

The cruciate ligaments, collateral ligaments, quadriceps mechanism, patellar tendon, and popliteus muscle/tendon are intact, without evidence of tearing. The patellar retinacula are intact. The popliteal neurovascular bundle is unremarkable.

There is horizontal tear of the anterior body lateral meniscus extending to the tibial articular surface (series 6 image 14). Shallow, undersurface irregularity of the posterior horn of the lateral meniscus is also seen (series 8 image 22). There is a

Copies to: KOH, JASON L.

KOH, JASON L.

| NORTHSHORE UNIVERSITY HEALTHSYSTEM | EVANSTON HOSPITAL |
|---|---|

**DEPARTMENT OF DIAGNOSTIC RADIOLOGY**

| Patient Name: MOORE-FOTSO, DOROTHY ANN | Age: 57 years          Sex: F |
|---|---|
| Account Number: 60187848 | Date of Birth: 4/24/57 |
| Patient Location: MRI EV | |

| Accession #:<br>MR-13-0044891 | Procedure Name:<br>MRI Knee W/O Contrast, (Right) | Exam Date<br>10/16/13 22:27:00 | Ordering Physician:<br>KOH, JASON L. |
|---|---|---|---|

complex multidirectional tear of the body and posterior horn of the medial meniscus, extending to the root ligament. There is mild extrusion of the medial meniscus into the medial gutter.


IMPRESSION:

1. Moderate to severe tricompartment osteoarthritis with chondromalacia, marginal osteophytes, and joint space narrowing as described in detail above.

2. Horizontal tear of the anterior body lateral meniscus extending to the tibial articular surface. Shallow undersurface irregularity of the posterior horn lateral meniscus is also seen, suspicious for a tear.

3. Complex multidirectional tear of the body and posterior horn of the medial meniscus, extending to the root ligament. There is mild extrusion of the medial meniscus into the medial gutter.


Copies to: KOH, JASON L.

KOH, JASON L.

## NORTHSHORE UNIVERSITY HEALTHSYSTEM

## EVANSTON HOSPITAL

### DEPARTMENT OF DIAGNOSTIC RADIOLOGY

**Patient Name:** MOORE-FOTSO, DOROTHY ANN
**Account Number:** 60187848
**Patient Location:** MRI EV

**Age:** 57 years          **Sex:** F
**Date of Birth:** 4/24/57

**Accession #:**
MR-13-0044891

**Procedure Name:**
MRI Knee W/O Contrast, (Right)

**Exam Date**
10/16/13 22:27:00

**Ordering Physician:**
KOH, JASON L.

4. Small suprapatellar joint effusion.  No intra-articular loose body.

This exam was dictated at Evanston Hospital.

This report is dictated with a resident or fellow.  I personally reviewed the study and interpretation and agree with the findings documented in the report.

FINAL REPORT

Thank you for referring your patient to NorthShore University HealthSystem

Dictated on: 10/17/2013 08:32
Dictating Resident/Fellow/Radiologist: RALHAN, TARUNA
Transcribed by: PT  10/17/2013 08:32
Electronically Verified and Signed by: WENZKE, DANIEL R.  MD  10/17/2013 15:26

Copies to: KOH, JASON L.

KOH, JASON L.

Print Date: 08/04/14
Print Time: 2:33 PM

Page 3 of 3

Dorothy Ann Moore
721 West 107th Street
Chicago, Illinois 60628
(773) 468-8363
**e-mail**:dmoorefotso@sbcglobal.net

July 01,2015

**Claims**

**Attention: Darden, Linda (ldarden@markelcorp.com**
**Fax: (855) 662-7535**
**Direct: (804) 217-8823**

**Document Contents:**

**Certification of Liability Insurance-1pg.**
**Injury Claim-1pg.**
**Medical Summary-1pg.**

**Contract Experience**
**Medical**
**Pictures**
Will forward picture of width of Temporary Wood Deck Step placed in terrain in front of garage prior to picture shown.

Picture shown is final width of area between garage door and concrete to alley for stamped concrete and heated cables.

**Total Pages with cover sheet**: __71__

Sincerely,

Dorothy Ann Moore

# CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)**
03/26/2013

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Biz Broker Inc | PHONE (A/C, No, Ext): (773) 777-1040 | | FAX (A/C, No): (773) 777-4443 |
| 3357 N Harlem | E-MAIL ADDRESS: | | |
| Chicago IL 60634 | | | |
| (773) 777-1040 | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : ESSEX INSURANCE COMPANY | | |
| INSURED | INSURER B : | | |
| LIFETIME REMODELERS INC | INSURER C : | | |
| 2874 N. LINCOLN AVE #LL-45 | INSURER D : | | |
| CHICAGO, IL 60659 | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES     CERTIFICATE NUMBER:          REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | **GENERAL LIABILITY** | | | | | | EACH OCCURRENCE | $ 1,000,000 |
| | X COMMERCIAL GENERAL LIABILITY | | | 3DJ9957 | 03/21/2013 | 03/21/2014 | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | CLAIMS-MADE OCCUR | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | POLICY PRO-JECT LOC | | | | | | | $ |
| | **AUTOMOBILE LIABILITY** | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | HIRED AUTOS NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| | UMBRELLA LIAB OCCUR | | | | | | EACH OCCURRENCE | $ |
| | EXCESS LIAB CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | DED RETENTION $ | | | | | | | $ |
| | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** Y / N | | | | | | WC STATU-TORY LIMITS OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) | N / A | | | | | E.L. EACH ACCIDENT | $ |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (Attach ACORD 101, Additional Remarks Schedule, if more space is required)

CITY OF CHICAGO IS ADDED TO GENERAL LIABILITY ON A PRIMARY AND NON CONTRIBUTORY BASIS.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| CITY OF CHICAGO - GENERAL CONTRACTOR | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| GENERAL CONTRACTOR LICENSING PROGRAM | |
| P.O. BOX 388249 | |
| CHICAGO, IL 60638-8249 | |
| Phone: ( ) - | AUTHORIZED REPRESENTATIVE |
| FAX: ( ) - | *(signature)* |
| 22,14 | |

© 1988-2010 ACORD CORPORATION. All rights reserved.

ACORD 25 (2010/05)     The ACORD name and logo are registered marks of ACORD

**ACORD**    **GENERAL LIABILITY NOTICE OF OCCURRENCE/CLAIM**

| | DATE (MM/DD/YYYY) |
|---|---|
| | 06/30/2015 |

| AGENCY | PHONE (A/C, No. Ext): | | NOTICE OF OCCURRENCE | | DATE OF OCCURRENCE AND TIME | | AM | DATE OF CLAIM | PREVIOUSLY REPORTED |
|---|---|---|---|---|---|---|---|---|---|
| Biz Broker Inc. | | | ✓ NOTICE OF CLAIM | | 07/01/2013 | 4:00 | ✓ PM | 06/30/2015 | ✓ YES   NO |
| 3357 N. Harlem | | | EFFECTIVE DATE | EXPIRATION DATE | | POLICY TYPE | | | RETROACTIVE DATE |
| Chicago, Il. 60654 | | | 03/21/2013 | 03/21/2014 | | OCCURRENCE   CLAIMS MADE | | | |
| FAX (A/C, No): 773 777-4443 E-MAIL ADDRESS: * | | | COMPANY | NAIC CODE: | | MISCELLANEOUS INFO (Site & location code) | | | |
| CODE: * | | SUB CODE: * | Essex Insurance Company | | | * | | | |
| AGENCY CUSTOMER ID: * | | | POLICY NUMBER | | | REFERENCE NUMBER | | | |
| | | | 3DJ9957 | | | * | | | |

| INSURED | | | CONTACT | ✓ CONTACT INSURED | |
|---|---|---|---|---|---|
| NAME AND ADDRESS | SOC SEC # OR FEIN: | | NAME AND ADDRESS | | WHERE TO CONTACT |
| Lifetime Remodelers Inc. | | | Joey Halperin | | * |
| 2874 N. Lincoln Ave. #LL-45 | | | Lifetime Remoderlers, Inc. | | |
| Chicago,Il. 60659 | | | 5875 N. Lincoln | | WHEN TO CONTACT |
| Regulated Business Lic#2246016 | | | Suite 45 | | |
| | | | Chciago,Il.60659 | | * |
| RESIDENCE PHONE (A/C, No) | BUSINESS PHONE (A/C, No, Ext) 773 901-7663 | | RESIDENCE PHONE (A/C, No) | BUSINESS PHONE (A/C, No, Ext) | |

### OCCURRENCE

| LOCATION OF OCCURRENCE (Include city & state) | 721 West 107th Street Chicago, Il. 60628-3103 | AUTHORITY CONTACTED Joey Halperin |
|---|---|---|
| DESCRIPTION OF OCCURRENCE (Use separate sheet, if necessary) | Experinced fall. Contractor removed temporary deck step.  He placed the step in garage terrain without telling me. | |

### POLICY INFORMATION

| COVERAGE PART OR FORMS (Insert form #s and edition dates) | | | | | | | |
|---|---|---|---|---|---|---|---|
| GENERAL AGGREGATE | PROD/COMP OP AGG | PERS & ADV INJ | EACH OCCURRENCE | FIRE DAMAGE | MEDICAL EXPENSE | DEDUCTIBLE | PD |
| 2,000,000.00 | 2,000,000.00 | 1,000,000.00 | 1,000,000.00 | | 5,000.00 | | BI |
| UMBRELLA/ EXCESS | UMBRELLA | EXCESS | CARRIER: | | LIMITS: | | |
| | | | | | AGGR | PER CLAIM/OCC | SIR/ DED |

### TYPE OF LIABILITY

| PREMISES: INSURED IS | ✓ OWNER | TENANT | OTHER: | TYPE OF PREMISES Home Owner |
|---|---|---|---|---|
| OWNER'S NAME & ADDRESS (If not insured) | Dorothy Ann Moore- 721 West 107th Street Chicago, Il. 60628-3103 | | | |
| | | | | OWNERS PHONE (A/C, No. Ext): 773 468-8353 |
| PRODUCTS: INSURED IS | MANUFACTURER | VENDOR | OTHER: | TYPE OF PRODUCT |
| MANUFACTURER'S NAME & ADDRESS (If not insured) | | | | |
| | | | | MANUFACT PHONE (A/C, No. Ext): |
| WHERE CAN PRODUCT BE SEEN? | | | | |
| OTHER LIABILITY IN-CLUDING COMPLETED OPERATIONS (Explain) | | | | |

### INJURED/PROPERTY DAMAGED

| NAME & ADDRESS (Injured/Owner) | Dorothy Ann Moore 721 West 107th Street, Chicago, Il 60628-3103 | | | PHONE (A/C, No, Ext) 773-468-8363 |
|---|---|---|---|---|
| AGE 58 | SEX F | OCCUPATION Teacher | EMPLOYER'S NAME & ADDRESS CPS, 125 South Clark St. Chgo. 60603 | PHONE (A/C, No, Ext) 773 553-1000 |
| DESCRIBE INJURY | FATALITY Torn Meniscus.ChangMRI:Cervical/Lumbar | WHERE TAKEN Deck Step | WHAT WAS INJURED DOING? Walking down steps. | |
| DESCRIBE PROPERTY (Type, model, etc) | Ranch with Full Basement | ESTIMATE AMOUNT | WHERE CAN PROPERTY BE SEEN? 721 West 107th Street Chicago, Il. 60628 | WHEN CAN PROPERTY BE SEEN? Via pictures/ in person |

### WITNESSES

| NAME & ADDRESS | BUSINESS PHONE (A/C, No, Ext) | RESIDENCE PHONE (A/C, No) |
|---|---|---|
| | | |

| REMARKS | | |
|---|---|---|
| | | |

| REPORTED BY | REPORTED TO Joey Halperin | SIGNATURE OF INSURED | SIGNATURE OF PRODUCER |
|---|---|---|---|

ACORD 3 (2004/06)     NOTE: IMPORTANT STATE INFORMATION ON REVERSE SIDE     © ACORD CORPORATION 1986

**MARKEL**

July 13, 2015

Ms. Dorothy Ann Moore
721 West 107th Street
Chicago, IL 60628-3102

Re:     Insured:        LIFETIME REMODELERS INC
        Claimant:       Dorothy Ann Moore
        Policy No.:     3DJ9957-0
        File No:        C039042
        Date of Loss:   7/1/13

Dear Ms. Moore:

Markel Service, Incorporated is the claims service administrator for Essex Insurance Company. Essex insures Lifetime Remodelers, Inc.

You reported in an email that, "On July 1, 2013, I fell and was injured; the contractor removed the temporary deck step without telling me. He placed the step in the garage terrain (See detail pg. 5 of 8; para. 4 and 5)." You also indicated in your letter to the insured (which was never forwarded to us by our insured) that just prior to your fall, you had turned backwards to step down. The diagnosis of a torn meniscus was not made until approximately three months later.

We do not see that any lawsuit was filed for your fall. At this time, it appears that the statute of limitations has passed and we therefore must deny your claim.

Very truly yours,

MARKEL SERVICE, INCORPORATED

*Aimee Venn*

Senior Claims Examiner
avenn@markelcorp.com

Markel - Claims
Arizona · California · Illinois · Nebraska · New Jersey · New York · Virginia · Wisconsin
P.O. Box 2009, Glen Allen, VA 23058-2009  (800) 362-7535  Fax (855) 662-7535  markelclaims@markelcorp.com
California License: Markel West Insurance Services #OD95581
www.markelcorp.com

MARKEL®

**Markel - Claims**
P.O. Box 2009
Glen Allen, VA 23058-2009

RICHMOND
VA 230
14 JUL '15
PM 6 L

UNITED STATES POSTAL

$ 00.48⁵

02 1M
0003804551
MAILED FROM ZIP CODE 23059

JUL 14 2015

Ms. Dorothy Ann Moore
721 West 107th Street
Chicago, IL 60628-3102